# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
April 12, 2011 Session

## STATE OF TENNESSEE v. GARY BOHANNON

**Appeal from the Criminal Court for Shelby County**
No. 08-03684     Chris Craft, Judge

No. W2010-00398-CCA-R3-CD  - Filed June 27, 2011

A Shelby County Criminal Court jury convicted the defendant, Gary Bohannon, of one count of premeditated first degree murder, *see* T.C.A. § 39-13-202(a)(1) (2006), for which he received a life sentence. In addition to challenging the sufficiency of the evidence to support his conviction, the defendant also contends that the trial court erroneously admitted as evidence at trial (1) a witness's statement to law enforcement, (2) a crime scene photograph of the deceased victim, and (3) a tape recording of the 9-1-1 telephone call reporting the shooting. Discerning no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Joseph McCluskey (on appeal); William D. Massey and Norma McCluskey (at trial), Memphis, Tennessee, for the appellant, Gary Bohannon.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William B. Gibbons, District Attorney General; Marianne Bell and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On October 17, 2007, Ronald Moore was shot to death at Allstar Auto Repair, a Memphis auto-body shop. He suffered seven gunshots wounds and died on the floor of the shop before the paramedics arrived. Tashe Disroe, who had met the victim for the first time that day and knew him by his nickname, Twin, recalled that the victim was helping her friend, Larry Ambrose, transport some new tires and wheel rims to the shop to see if they matched Ambrose's car that was being painted. She and Mr. Ambrose arrived at the shop

at 8:00 in the evening, and she sat in a chair while everyone else spent time "talking [and] mingling." After spending about an hour and a half at the shop, the victim "finally showed up" with two sets of the tires and wheel rims. The men rolled the tires and rims to the car to see how they matched. About 10 minutes after the victim's arrival at the shop, "this guy walked in" and "grabbed" another man's sunglasses or hat like he was "just . . . playing around, and then it turned into a different scene after that."

Ms. Disroe described the "guy" as tall and slim with a dark complexion. She said he was "not stocky at all." The man called to the victim from across the shop and said, "Twin, you need to come holler at me," and motioned for the victim to come outside with him. The victim refused to go talk to the man. The man then said to the victim, "[I]f [you] don't come holler at [me, I'm] going to kill everybody in [the shop] . . . shoot everybody in [the shop]." At that point, Ms. Disroe knew that "something [wa]sn't right" and that "something was fixing to go wrong." She soon realized that "everybody was getting out of there and running because [the man] had a gun."

Ms. Disroe, Mr. Ambrose, and the victim were standing near the roll-up door of the shop when the man entered the shop. When the victim saw the man, he began to move around the car to get away from the man. For some time, both men circled the car. The man asked the victim to come outside with him several times, but the victim continued to try to get away from him. Ms. Disroe said that the victim "charged" the man in an attempt to disarm him. Within two to three seconds, Ms. Disroe heard gunshots that sounded like they "were going inside someone." Ms. Disroe was in shock, and Mr. Ambrose told her to "come on." They both fled through the roll-up door. As they ran away, Ms. Disroe heard up to eight gunshots. She saw the man run from the shop and saw the victim lean against a door frame before falling to the floor.

Ms. Disroe telephoned 9-1-1, but she was shaking so badly that Mr. Ambrose took the telephone from her and spoke to the 9-1-1 dispatcher. She recalled Mr. Ambrose's walking to the front of the shop to tell the dispatcher the address of the shop. Mr. Ambrose told Ms. Disroe not to go inside the shop because he did not want her to see the victim's condition. She heard someone say that the victim was still breathing. Because no one was helping him, she entered the store and followed a trail of "blood dots" to find the victim fallen in a corner trying to breathe. She tried to move him but was unable. The victim took one deep breath. Ms. Disroe "just ran out [and] left."

When Ms. Disroe ran outside, the police had just arrived. She and other witnesses were placed in separate patrol cars and questioned. She told a male officer that she thought she could identify the shooter. Memphis Police Department (MPD) officers took Ms. Disroe to the police station, where she gave a statement and drew a diagram of the scene.

Ms. Disroe identified the defendant as the shooter from a photographic array although the defendant's hair was different on the night of the offense than in the photograph. She said that she "looked at [his] face and [she] knew exactly who it was" and that the defendant was the man she "saw in the shop that night with a gun."

On cross-examination, Ms. Disroe acknowledged that she said the defendant and the victim "walk[ed]" around the car in her initial statement to the police. She explained that "[w]alking, running fast, [the victim] was trying to get away from [the defendant]. Same thing." She reiterated that the victim tried to disarm the defendant, that the two men "tussled," and that the gun went off "[a] couple seconds after" the struggle began. She said that she was "shaky" and "discombobulated" after the incident. Regarding the defendant's insistence on talking to the victim, she recalled that "something was going to happen that night whether it was going to inside that shop or on the outside."

Marcus Moore was working at Allstar Automotive on the night of the shooting. He was busy painting Mr. Ambrose's car when Mr. Ambrose and a female friend who he had never met came by the shop to deliver some new tires and wheel rims for the car. Some time later, the victim showed up with the other two sets of tires and wheel rims. Within five minutes, the defendant arrived. Mr. Moore had never met either the defendant or the victim. Mr. Moore said that there seemed to be a dispute between the two men, and when he turned from his painting tasks, he saw that the defendant had a gun that looked like a black nine millimeter. Mr. Moore never saw the victim with a weapon. The defendant tried to get the victim to come outside, but the victim resisted. As Mr. Moore ran from the store, he heard seven rapid shots. He then waited outside for the police to arrive. He told the police that he did not think he could identify the defendant because he "didn't even look at [the defendant], once [he] saw the gun [he] just tried to get out of there."

During a jury-out hearing, the trial court determined Mr. Ambrose to be an unavailable witness because of unsuccessful efforts to locate him for trial. The court further ruled admissible the recorded preliminary hearing testimony of Mr. Ambrose. *See* Tenn. R. Evid. 804(b)(1) (allowing former testimony of an unavailable declarant under specific circumstances). Although the record reveals that the preliminary hearing testimony was played for the jury, the preliminary hearing recording was not included in the record on appeal, and the defendant does not allege any error by its admission. Through Eddie Heaston, the Shelby County 9-1-1 Dispatch Supervisor, the jury heard a tape recording of Mr. Ambrose's 9-1-1 telephone call. In the brief recording, the excited caller reports that "somebody just got shot" and directs the ambulance service to the address of the body shop. At one point during the recording, Mr. Ambrose is overheard speaking with someone else at the scene, but the content of that conversation is inaudible. Mr. Ambrose tells the 9-1-1 operator, "Please hurry up, send an ambulance . . . somebody shot Twin."

Wardell Seals, Jr., a paramedic with the Memphis Fire Department, arrived at the shop at 9:47 p.m. in response to the report of a "gunshot wound." He arrived to find that the MPD had secured the scene and cleared it for the paramedics' safe entrance into the building to treat the victim. Mr. Seals entered the shop to find the victim "lying on his knees" and "obviously deceased because of the nature of the bullet wounds" to the victim's neck and abdomen. Mr. Seals recalled that one of the wounds penetrated the main artery in the victim's neck and that, therefore, there was a lot of blood surrounding the victim's body. Instead of moving the victim, Mr. Seals placed the heart monitor on the victim's back and observed "no sign of life." The paramedics informed the MPD that the victim was dead and turned the scene back over to the MPD for further investigation. He said that when a victim is found dead at a scene, the usual protocol was for the body to be removed by MPD or the medical examiner.

MPD Officer Veronica Carson arrived at the shop at 9:30 p.m. in response to the report of a shooting. She found the victim "on the ground against a wall . . . deceased." Officer Carson assisted in securing the scene. She placed several witnesses in separate squad cars to prevent their memories from being tainted by conversations with one another. Officer Carson remained at the scene until detectives arrived.

MPD Sergeant Kirby Brewer of the felony response team arrived at the scene at 10:10 p.m. to find that the uniformed officers had already secured the scene. He recalled that no weapons were found near the victim. Upon learning that the homicide bureau detectives were on their way, he began interviewing witnesses. He interviewed Ms. Disroe who he described as "upset" yet "able to speak with [him] and tell [him] what she had observed." Sergeant Brewer recounted the details of Ms. Disroe's statement. She told him that the victim began to back away from the defendant immediately when he saw the defendant enter the shop. She said the victim kept telling the defendant to "go on" and that the defendant told the victim that he did not want to have to shoot the victim inside the shop. Ms. Disroe told Sergeant Kirby that as she and Mr. Ambrose "stepped out" of the pull-down door, she heard seven or eight gunshots. Ms. Disroe told Sergeant Brewer that she "thought she could" identify the defendant. Sergeant Brewer left the scene at 11:30 p.m. when the homicide detectives arrived to take over the investigation.

MPD Crime Scene Investigator Jeffrey Alan Garey labeled evidence and completed a sketch at the crime scene. When he entered the shop, he found the victim in a "semi[-]crouched position" surrounded by a "large amount of red liquid substance we believed to be blood." Blood was found "on the door jam" leading into the room where the victim lay, on the floor "underneath the victim in all directions," and on the wall above the victim. In the doorway leading into the room, Investigator Garey collected six spent Winchester .357 shell casings, one spent bullet, and three bullet fragments that were sent to

the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Investigator Garey found no weapons on or around the victim. He did, however, discover over $1200 and two bags containing marijuana-like and cocaine-like substances in the victim's pants pockets which he also sent to the TBI Crime Lab for analysis.

MPD Crime Scene Investigator David Payment assisted Investigator Garey in collecting evidence at the scene. He also sketched a crime scene diagram depicting the locations of all recovered evidence.

MPD Homicide Bureau Sergeant Mundy Quinn arrived at the scene at 11:05 p.m.. During the course of the initial investigation, the defendant became a suspect. Sergeant Quinn included the defendant's photograph in an array, and Mr. Ambrose identified the defendant as the shooter. After a crime apprehension team was unable to locate the defendant in the Memphis area, the defendant's name was placed on a national website on February 6, 2008. Shelby County Sheriff's Office Detective Anthony Townsend, working with the Mid-South Fugitive Task Force of the United States Marshal Service, assisted in locating the defendant in Indianapolis. On February 27, 2008, the defendant was arrested by the United States Marshal Service in Indianapolis and extradited to Tennessee for prosecution.

Doctor Miguel Laboy, Assistant Medical Examiner for Shelby County, conducted the autopsy on the victim. He determined that the victim suffered seven gunshot wounds to different areas of his upper legs, groin, torso, and head. One wound that entered the right side of the victim's face and exited his neck proved fatal when it severed the carotid artery. Based upon the presence of soot and stippling near the wound, Doctor Laboy determined that two of the seven wounds (one to the head and one to the wrist) occurred at intermediate range. Although the victim's clothing was "soaked in blood," Doctor Laboy determined that the five other wounds occurred from an undetermined distance between the defendant and the victim based upon the absence of any soot on the clothing. Doctor Laboy testified that the cause of death was "multiple gunshot wounds" and opined that an arterial injury such as that suffered by the defendant was "rarely survivable."

TBI Special Agent Cervinia Braswell examined the bullets, casings, and bullet fragments submitted for analysis to determine the "mechanical fingerprint" of the weapon fired by the defendant. Through her examination, she determined that all the casings and the bullet were fired from the same gun which had "characteristics most common to a Glock" handgun. She further described a Glock as a semi-automatic weapon with a safety mechanism built into the trigger. As such, the safety would need to be "defeated" each time the gun was fired. She opined, however, that this type of safety mechanism did not prevent the gun from being fired "rapidly."

With the conclusion of Special Agent Braswell's testimony, the State rested its case. Following an extensive *Momon* colloquy, the defendant elected not to testify. *See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999). The defendant presented no evidence. Based upon this evidence, the jury convicted the defendant of premeditated first degree murder, and the trial court imposed a life sentence by operation of law. *See* T.C.A. § 39-13-208(c). Timely post-trial motions followed. This case is properly before the court.

*Sufficiency of the Evidence*

The defendant contends that the evidence is insufficient to support his conviction of premeditated first degree murder.

We review the defendant's claim attacking the sufficiency of the evidence to support his convictions mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Tennessee Code Annotated defines first degree murder, as is applicable in this case, as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). The Code further provides that "'premeditation' is an act done after the exercise of reflection and judgment . . . . [T]he intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* at § 39-13-202(d).

The evidence in the case shows that the defendant arrived at the shop armed with a handgun and asked the victim to come outside with him. The victim immediately felt threatened by the defendant and resisted the defendant's entreaties to go outside both

verbally, by telling the defendant to "go on," and physically, by attempting to hide behind Mr. Ambrose's car. The defendant threatened that if the victim would not go outside he would shoot everyone in the shop. A struggle ensued when the victim attempted to disarm the defendant, and the defendant fired a rapid succession of shots at the victim. The victim tried to evade the defendant by moving toward another room in the shop and left smeared blood on the door jam. In a corner of the room, the victim bled to death from his wounds. Crime scene investigators documented blood on the wall above where the victim was found. The defendant fled the scene that night and was not apprehended until months later in Indianapolis. We conclude that the evidence supports the defendant's conviction of premeditated first degree murder in this case.

*Admissibility of Witness's Prior Statement*

The defendant contends that the trial court erred by allowing Sergeant Brewer to testify concerning the substance of Ms. Disroe's statement made to him on the night of the incident. The State argues that evidence of the statement was properly admitted to rehabilitate Ms. Disroe's credibility following her impeachment on cross-examination with inconsistencies between her testimony at trial and her statement made to Sergeant Brewer at the scene on the night of the shooting.

Initially, we observe that questions concerning the admissibility of impeachment or rehabilitation evidence rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

"A witness's prior inconsistent statement may be used to impeach the witness." *State v. Philpott*, 882 S.W.2d 394, 406 (Tenn. Crim. App. 1994). Tennessee Rule of Evidence 613(b) further provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." Our supreme court has held that extrinsic evidence of a prior inconsistent statement is not admissible unless the witness "either denies or equivocates to having made the prior inconsistent statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998).

In the present case, the defendant cross-examined Ms. Disroe concerning certain inconsistencies between her testimony at trial and her statement made to Sergeant Brewer on the night of the shooting. In each instance, Ms. Disroe acknowledged the inconsistency between her statement and her testimony at trial. She, however, attempted to mitigate the purported inconsistencies by explaining that, regardless of the wording she had utilized at the time of her statement to Sergeant Brewer, the victim was trying to evade the defendant due to an apparent fear of the defendant. For example, when confronted with her initial statement that the victim was "walking" from the defendant rather than "running" from the defendant as testified to at trial, Ms. Disroe said, "Walking, running fast, he was trying to get away from him. Same thing." In our view, Ms. Disroe acknowledged and explained her prior statement when confronted with the inconsistencies during her cross-examination. Therefore, any extrinsic proof of the prior statement was inadmissible under Rule 613(b). *See Martin*, 964 S.W.2d at 567. In that vein, the trial court's ruling that Ms. Disroe's prior statement offered through Sergeant Brewer was admissible via Rule 613(b) was erroneous.

That being said, the State argues that the extrinsic evidence of her prior statement was still admissible to rehabilitate Ms. Disroe's credibility. This court has observed that "[g]enerally, prior consistent statements are not admissible to rehabilitate a witness who has been impeached." *State v. Winters*, 137 S.W.3d 641, 664 (Tenn. Crim. App. 2003) (citing *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn. 1990)). However, "[w]here specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context." *Boyd*, 797 S.W.2d at 594.

In our view, Ms. Disroe adequately explained the variances between her statement to Sergeant Brewer and her testimony at trial. As such, little or no need existed for Sergeant Brewer's testimony concerning the prior statement for the purpose of rehabilitating Ms. Disroe's credibility. *See State v. Benton*, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988) (stating that before a prior statement is admissible, the witness's testimony must have been attacked to the extent that it requires rehabilitation). Furthermore, in his cross-examination of Ms. Disroe, the defendant made no insinuation of fabrication that would give rise to admitting the prior statement in order to place the overall statement in context. *See Winters*, 137 S.W.3d at 664. Therefore, we conclude that the trial court committed an abuse of discretion by admitting the prior statement at trial. We further conclude, however, that the trial court's error was harmless in this case because the details of the prior statement did not contribute any additional evidence apart from that which was already elicited during Ms. Disroe's cross-examination.

*Admissibility of Photograph of Deceased Victim*

The defendant next argues that the trial court erred by admitting a photograph of the deceased victim taken at the scene because, he contends, the photograph was cumulative to witness testimony and the bloody nature of the photograph was gruesome and prejudicial. *See* Tenn. R. Evid. 403. The State contends that the probative value of the photograph, to depict the position of the victim's body as he died, was not substantially outweighed by the danger of unfair prejudice posed by the graphic nature of the photograph.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Id.* 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The trial court determined that the photograph was relevant to show that the victim died from his wounds as he was attempting to escape from the defendant. The trial court also determined that the photograph was not particularly gruesome because, although it showed a substantial amount of blood soaking the victim's clothing, the victim's face and any wounds were not shown in the photograph. In our view, the photograph does depict the victim in a slumped over, almost fetal position, in the corner of a room where he attempted to flee the defendant's assault. Although the photograph does depict the victim's bloody clothing and a rather bloody area surrounding the victim, no close-up views of wounds are shown, and the victim's face and neck are not visible in the photograph. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photograph.

*Admissibility of 9-1-1 Tape Recording*

In his final issue, the defendant contends that the trial court erred by admitting

-9-

the 9-1-1 tape recording of Mr. Ambrose's telephone call to report the shooting. At trial and on appeal, the defendant argues that the tape contained hearsay and had no probative value. The State concedes that the tape recording was "not particularly relevant" to its case-in-chief but argues that the admission of the recording was not unfairly prejudicial and that any error in its admission was harmless.

During a hearing outside the presence of the jury, the trial court determined that Mr. Ambrose was an unavailable witness and ruled admissible his prior testimony from the preliminary hearing. Although a transcript of the preliminary hearing is not included in the record on appeal, we discern from this record that Mr. Ambrose placed the 9-1-1 telephone call to report the shooting and seek emergency medical assistance for the victim. Through the testimony of Mr. Heaston, the State presented the 9-1-1 tape recording of Mr. Ambrose's call. The defendant objected on the basis of irrelevance and hearsay. In allowing its admission, the trial court ruled that the tape recording was not testimonial and, therefore, its admission did not implicate the defendant's confrontation rights, and that the recording was admissible as an excited utterance. *See* Tenn. R. Evid. 803(2).

The recording reveals that the caller, purportedly Mr. Ambrose, was in an obviously excited state. He urged the operator to send medical assistance quickly. Although Mr. Ambrose did not identify the shooter, he did say that "somebody shot Twin."

To be sure, Tenn. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Furthermore, "[a]ll relevant is admissible" and "[e]vidence which is not relevant is not admissible." Tenn. R. Evid. 402. We conclude that the evidence contained in the 9-1-1 tape recording was marginally relevant to establish the time frame of the shooting in relation to its reporting and was, therefore, admissible.

Turning to the defendant's allegation that the 9-1-1 tape recording was hearsay, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id*. 802. The Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230

S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Gilley*, 297 S.W.3d at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo. *Id.*

In this case, the State sought admission of Mr. Ambrose's statements contained on the 9-1-1 tape recording via the excited utterance exception to the hearsay rule, embodied at Tennessee Rule of Evidence 803(2), which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(2). Three requirements must be met before a statement qualifies for admission pursuant to this hearsay exception:

> The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (citations omitted). Our supreme court has stated that the "'ultimate test'" of admissibility via the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, Mr. Ambrose telephoned 9-1-1 within minutes of the shooting in an urgent effort to seek medical assistance for the victim. The tape recording reveals obvious

and apparent stress in the tone of his voice. Furthermore, the tape recording does not contain any identification of the defendant as the shooter and only relates information that the victim had been shot and was in need of immediate medical attention. Thus, we disagree with the defendant that the evidence served only to inflame the jury. Accordingly, based upon a de novo application of the law to the factual findings of the trial court, we conclude that the trial court did not err by admitting Mr. Ambrose's hearsay statements contained on the 9-1-1 tape recording.

*Conclusion*

The evidence is sufficient to support the defendant's conviction of premeditated first degree murder. Discerning no other reversible error, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE